1
2
3
4
5
6

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

7
8
9  CHRISTOPHER DUANE BAKKEN,          1:05-cv-1133-LJO-DLB (HC)

10                    Petitioner,         FINDINGS AND RECOMMENDATION
                                          REGARDING PETITIONER'S MOTION FOR
11         v.                             IMMEDIATE RELEASE, MOTION FOR
                                          SUMMARY JUDGMENT, AND PETITION
12                                        FOR WRIT OF HABEAS CORPUS
   A. K. SCRIBNER, et.al.,
13
                      Respondents.
14  _____/

15
        Petitioner is a state prisoner proceeding with a petition for writ of habeas corpus pursuant
16
   to 28 U.S.C. § 2254.   Petitioner is represented by Meredith Fahn, Esq.
17
                              BACKGROUND INFORMATION
18
        Petitioner is currently serving a sentence of twenty-five years to life following his
19
   conviction of being an inmate in possession of a weapon.   Petitioner filed a timely appeal, and
20
   the California Court of Appeal affirmed the judgment.   The California Supreme Court denied
21
   review on June 9, 2004.
22
        Petitioner filed the original federal petition in this case on September 7, 2005.   Petitioner
23
   filed an amended petition on December 11, 2005.
24
        On November 22, 2005, Petitioner filed a state habeas corpus petition in the Kings
25
   County Superior Court.   The petition was denied on March 10, 2006.
26
        In the meantime, on February 22, 2006, Petitioner filed a motion to stay and hold the
27
   petition in abeyance pending exhaustion.   On February 27, 2006, Respondent filed a non-
28

1   opposition motion.

2       On March 7, 2006, the Court granted Petitioner's motion to stay the instant petition and

3   directed Petitioner to file a status report every sixty days thereafter.

4       On April 10, 2006, Petitioner filed a petition in the California Court of Appeal, Fifth

5   Appellate District. The petition was denied on December 7, 2006.

6        On December 20, 2006, Petitioner filed a petition for review in the California Supreme

7   Court. On February 28, 2007, the petition for review was granted and the matter was transferred

8   to the state appellate court with directions to issue an order to show cause why Petitioner was not

9   entitled to relief based on ineffective assistance of trial counsel.

10      On March 6, 2007, the Fifth Appellate District vacated its December 7, 2006 order

11  denying the habeas petition. The appellate court then issued an order to show cause why

12  Petitioner was not entitled to relief based on ineffective assistance of trial counsel. The appellate

13  court also ordered a hearing on the issue.

14      An evidentiary hearing was held over several days in early 2008. The court denied the

15  habeas petition thereafter.

16      Petitioner filed a habeas petition in the Fifth Appellate District on August 27, 2009. The

17  petition was denied on December 10, 2009.

18      Petitioner filed a petition for review on December 23, 2009. The petition was denied on

19  February 18, 2010.

20      Petitioner filed a Second Amended Petition in this Court on March 22, 2010.

21      On March 7, 2011, the Court dismissed Claims One and Two of the Second Amended

22  Petition without prejudice for failure to exhaust the state judicial remedies.

23      On April 5, 2011, Petitioner filed a motion for summary judgment on Claim Five of the

24  Second Amended Petition, along with a motion for immediate release. On May 25, 2011,

25  Respondent filed an opposition to Petitioner's motion for immediate release, and Petitioner filed

26  a reply on June 6, 2011.

27      On June 16, 2011, Respondent filed an opposition to Petitioner's motion for summary

28  judgment, and Petitioner filed a reply on June 217, 2011.

1    Respondent also filed a second amended answer to the Second Amended Petitioner on

2    June 23, 2011.

3                         STATEMENT OF FACTS[1]

4         On direct appeal, the appellate court made factual findings with respect to some of the

5    claims presented in the Second Amended Petition.  The Court must consider these facts.  To the

6    extent the facts were further developed in relation to Claim Five of the Second Amended Petition

7    during the state court evidentiary, such facts will be discussed in the analysis portion of that

8    claim. As Respondent correctly argues, the Court must presume the correctness of a factual issue

9    determined by a state court, absent clear and convincing evidence.  See Pirtle v. Morgan, 313

10   F.3d 1160, 1168 (9th Cir. 2002), citing, Appel v. Horn, 250 F.3d 203, 210 (3d Cir. 2001); 28

11   U.S.C. § 2254(e)(1).  The facts as determined on direct appeal are as follows:

12        Appellant is an inmate at Corcoran State Prison.  On July 17, 2001,
     correctional officers Chris Daulton and Ruben Zaragosa approached appellant's
13   cell and asked him whether he wanted to go to the exercise yard.  Appellant
     responded in the affirmative, and the officers began the process of removing
14   appellant from his cell.  Initially, the officers opened the food port door and had
     appellant extend his arms through the port while standing with his back to the
15   door.  The officers placed handcuffs on appellant and he removed his arms from
     the door.  The officers signaled another officer to open the door, while appellant
16   remained standing with his back to the door.  After the door was opened, appellant
     looked down over his shoulder and said "What's that" while kicking something
17   away from his cell.  Daulton testified that he saw an object wrapped in paper on
     the ground that he pushed back into appellant's cell.  The officers then transported
18   appellant to the exercise yard and Daulton subsequently returned to examine the
     item he had seen on the ground.  He discovered a sharpened metal object wrapped
19   inside of the paper.

20        Daulton testified that when he first saw the item in question it was in the
     track of the cell door.  He explained that the cell door is suspended above the floor
21   and the door slides into the wall.  After discovering the weapon, appellant was
     brought back from the yard and placed in a rotunda area.  After telling appellant
22   what was found in his cell, appellant began yelling something to the effect of
     "Spot, it's gone ... they've got it."  Daulton admitted he had not put appellant's
23   statement in his report, and the first time he told anyone of the statement was the
     first day of trial.  He claimed he had omitted the statement from the report because
24   he did not realize it was important at the time.  Daulton testified that Saragosa was
     present when appellant made the statement, and Daulton informed Sergeant
     Lloren of the statement that day.
25        Correctional officer Johnny Diaz testified that inmates in prison often
     transfer items from cell to cell with "fishing line."  Fishing line is made by tying
26   strips of cloth to each other and attaching a weight to the end.  The inmates throw

27

28   _____
     [1] The following statement of facts is taken from the state appellate court opinion on direct appeal as Lodged
     Document 2, which is presumed correct. 28 U.S.C. §§ 2254 (d)(2), (e)(1).

one end of the line onto the tier and hook it to another line. Then the item is attached to the line, and the inmate pulls it into his cell. Diaz stated that it is common to find fishing line in inmates' cells. Additionally, he noted that inmates sometimes hide weapons under their cell doors by securing the weapon to the bottom of the door. If the weapon comes loose, it will remain in the door track when the door is opened.

Medical technical assistant Damon Miller testified that he worked at the prison and had come into contact with appellant. He had problems with appellant not following procedure when taking his medication. As a result he informed the correctional officers, who searched the cell. Miller also requested appellant be moved to a cell with a solid door because appellant had threatened him.

The day before the weapon was found in the track of appellant's cell door, Miller informed Sergeant Adrian Lloren that appellant had not been taking his medication. Subsequently, Miller and Officer Juan Reya conducted a search of appellant's cell. Fishing line was recovered during the search.

FN4. Appellant became agitated when Miller arrived to search his cell. Appellant became calm after he was told that Miller would not participate in a search of his cell. After appellant was removed from his cell, Miller in fact participated in the search.

Correctional officer Juan Alvarez moved appellant to a new cell after Miller's complaint. During the move, all of appellant's belongings were searched. During the search Alvarez found a weapon wrapped in plastic hidden in a bag of soup noddles. He also found a syringe, an extra plunger, and three used matches during the search. Appellant does not challenge the conviction based upon the results of this search.

Defense Case

Zaragosa testified that he recalled appellant yelling something to "Spot" when he was in the rotunda area after Daulton found the weapon. He noted that the statement was not included in any report, but claimed he had told the prosecutor about the statement sometime prior to trial. The parties stipulated that Saragosa did not mention the statement to the prosecutor prior to trial.

Sergeant Lloren testified that he was present on the day the weapon was found on the floor in appellant's cell. He did not recall hearing appellant yell anything on that occasion.

Appellant claimed Miller planted the weapons in his cell. Appellant pointed to the fact that Miller assisted in a search of appellant's cell the day before one of the weapons was found in his cell.

(LD 2 at 3-5.)

## DISCUSSION

### I.   Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Kings County Superior Court, which is located within the jurisdiction of this Court. 28

1   U.S.C. § 2254(a); 2241(d).

2   　　On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

3   of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

4   enactment.  Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114

5   F.3d 1484, 1499 (9th Cir. 1997), cert. denied, 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting

6   Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107, 117 S.Ct.

7   1114 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059

8   (1997) (holding AEDPA only applicable to cases filed after statute's enactment).  The instant

9   petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

10  II.   Standard of Review

11  　　The instant petition is reviewed under the provisions of the Antiterrorism and Effective

12  Death Penalty Act which became effective on April 24, 1996.  Lockyer v. Andrade,  538 U.S. 63,

13  70 (2003).  Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

14  barred unless a petitioner can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of,
> clearly established Federal law, as determined by the Supreme Court of the United States;
> or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in
> light of the evidence presented in the State court proceeding.

18  28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

19  (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

20  　　As a threshold matter, this Court must "first decide what constitutes 'clearly established

21  Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71,

22  quoting 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this

23  Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as

24  of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words,

25  'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles

26  set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition,

27  the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal

28  principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in

1   . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of

2   review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van

3   Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v.

4   Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an

5   end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S.

6   at 126; Moses, 555 F.3d at 760.

7          If the Court determines there is governing clearly established Federal law, the Court must

8   then consider whether the state court's decision was "contrary to, or involved an unreasonable

9   application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28

10  U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if

11  the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a

12  question of law or if the state court decides a case differently than [the] Court has on a set of

13  materially indistinguishable facts." Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at

14  72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in

15  character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third

16  New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to

17  [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the

18  governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to"

19  clearly established Supreme Court precedent, the state decision is reviewed under the pre-

20  AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

21         "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

22  the state court identifies the correct governing legal principle from [the] Court's decisions but

23  unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

24  "[A] federal court may not issue the writ simply because the court concludes in its independent

25  judgment that the relevant state court decision applied clearly established federal law erroneously

26  or incorrectly.  Rather, that application must also be unreasonable."  Id. at 411; see also Lockyer,

27  538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

28  could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

1   Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

2   correctness of the state courts decision, the decision cannot be considered unreasonable.  Id.  If

3   the Court determines that the state court decision is objectively unreasonable, and the error is not

4   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

5   effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

6       Petitioner has the burden of establishing that the decision of the state court is contrary to

7   or involved an unreasonable application of United States Supreme Court precedent.  Baylor v.

8   Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

9   states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

10   state court decision is objectively unreasonable.  See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

11   Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

12       AEDPA requires considerable deference to the state courts.  "[R]eview under § 2254(d)(1)

13   is limited to the record that was before the state court that adjudicated the claim on the merits,"

14   and "evidence introduced in federal court has no bearing on 2254(d)(1) review."  Cullen v.

15   Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state

16   courts are presumed correct absent clear and convincing evidence to the contrary."  Miller-El v.

17   Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court

18   factual finding is not entitled to deference if the relevant state court record is unavailable for the

19   federal court to review.  Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

20   Tamayo-Reyes, 504 U.S. 1 (1992).

21   III.   Denial of Right to Testify and Present a Defense

22       Petitioner contends he was deprived of his constitutional right to testify and to present a

23   defense.  He contends defense counsel did not allow him to testify and failed to communicate

24   with him before and during trial.  Petitioner also points out that, after the trial, he was found not

25   guilty of the same offense by a prison administrative hearing officer.

26       A.   Right to Testify

27       The superior court rejected Petitioner's claim that defense counsel prohibited Petitioner

28   from testifying at trial.  During the evidentiary hearing, defense counsel explained that he advised

7

Petitioner against testifying because of his belief that he would not perform well under cross-examination and had an unpleasant demeanor which could be harmful.

A defendant's right to testify is a fundamental right. <u>Rock v. Arkansas</u>, 483 U.S. 44, 51-53 (1987). However, the right can be waived. A defendant is deemed to waive his right to testify by remaining "silent in face of his attorney's decision not to call him as a witness." <u>United States v. Pino-Noriega</u>, 189 F.3d 1089, 1095 (9th Cir. 1999).

In this case, Petitioner remained silent when defense counsel declined to call additional witnesses (e.g. Petitioner). Although Petitioner contends that he "did everything he could to attempt to get [defense counsel's] attention and insist upon my right to testify" (Decl. of Pet. at 19:13.), Petitioner did not speak up to the Court. Defense counsel was certain that Petitioner was aware if he wished to testify all he had to do was speak up to the judge. (RT 418-419.) Thus, his silence is deemed a waiver of his right to testify.

In addition, a defendant is presumed to assent to counsel's advise not to testify. <u>United States v. Joelson</u>, 7 F.3d 174, 177 (9th Cir. 1993). Furthermore, Petitioner has failed to establish that any purported state court error had a substantial and injurious effect or influence in determining the jury's verdict. <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637, 113 S.Ct. 1710 (1993). A defendant who testifies on his own behalf waives his privilege against self-incrimination with respect to the relevant matters covered by his direct testimony and subjects himself to cross-examination and impeachment by the government. <u>Brown v. United States</u>, 356 U.S. 148, 154-155 (1958); <u>United States v. Hearst</u>, 563 F.3d 1331, 1338 (9th Cir. 1977). Indeed, defense counsel stated that he believed the defense's case was stronger without Petitioner's testimony regarding the alleged conspiracy, and he opined that the jury would not believe such theory. (RT 429-430.) Thus, because Petitioner would have opened himself to arguably damaging impeachment by testifying, he cannot demonstrate that his potential testimony was likely to have changed the jury's verdict, and his claim fails on the merits.

B.     <u>Alleged Failure to Communicate</u>

Petitioner also claims that defense counsel failed to communicate with him. In the last reasoned decision, the superior court denied the claim.

Although counsel has a duty to communicate with his client, "there is no established minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel." Campbell v. Polk, 447 F.3d 270, 279 n.2 (4th Cir. 2006) (internal quotation marks omitted); see also Florida v. Nixon, 543 U.S. 175, 178 (2004) (duty to discuss potential strategies).  Petitioner must demonstrate that counsel's inadequate consultation caused actual prejudice.  In Payton v. Woodford, 258 F.3d 905, 922 (9th Cir. 2001), Payton claimed that during the year between counsel's appointment and commencement of trial, counsel only conferred with him for 8.1 hours.  However, because Payton failed to demonstrate that anything different would have happened had his counsel spent more time with him, there was not a reasonable probability the results of the proceeding would have been different.  Id., rev'd on other grounds, Brown v. Payton, 544 U.S. 133 (2005)).  The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel.  Morris v. Slappy, 461 U.S. 1, 14 (1983); see also Larson v. Palmateer, 515 F.3d 1057, 1067 (9th Cir. 2008) (relief foreclosed under AEDPA because defendant did not argue there was either an actual or apparent conflict of interest, but instead complained only about the lack of communication with counsel and counsel's strategic decisions).

Here, at the evidentiary hearing, defense counsel testified about the discussions he had with Petitioner, including discussions about whether Petitioner should testify, what he would testify to, and defense counsel's impressions of Petitioner.  Counsel was satisfied with his communications with Petitioner.  (Lod. Doc. 28 at 414.)  Defense counsel also testified that he discussed with Petitioner the potential testimony of inmates.  (Id. at 416-417.)  Counsel also recalled that Petitioner informed him an officer would testify that the weapon was planted; however, a defense investigator informed counsel that he spoke with the officer and found no favorable testimony could be provided.  (Id. at 418, 421-422.)  Defense counsel also stated that he read every paper Petitioner sent to him and counsel talked to Petitioner "plenty."  (Id. at 427, 432.)  Defense counsel also recalled having conversations with Petitioner regarding medical assistant Miller, Petitioner's prior convictions, and Petitioner's "planting" theory.  (Id. at 432-

433, 438-439.)  Given counsel's testimony at the evidentiary hearing, it was not objectively

unreasonable for the state court to find that counsel adequately communicated with Petitioner.

C.    Findings of the Administrative Hearing Officer

Petitioner points out that after the criminal trial, he had a "CDC 115" prison disciplinary

hearing on July 17, 2001, regarding the same crime.  Although he was found guilty in the

criminal matter, the CDCR hearing officer found Petitioner not guilty.  Petitioner contends the

hearing officer found that the weapon was outside in front of Petitioner's cell, not in his cell.

Petitioner contends that because he has been found not guilty in the administrative proceedings,

the state should be barred from retrying him.

The superior court rejected this claim noting the administrative hearing had no collateral

estoppel effect.  Under California Code of Regulations, a court verdict of guilty resulting from a

trial shall be accepted as the finding of fact on the same charges in a disciplinary hearing.  (Lod.

Doc. 28 at 322-323; Cal. Code Regs. tit. 15, § 3316(c)(3).

Although the administrative hearing officer found Petitioner not guilty because the

weapon was outside and not in his cell, this proceeding was not as thorough as the jury trial in

the Kings County Superior Court.  No witnesses testified at the administrative hearing and only

the reports were reviewed.  (Lod. Doc. 32, at 661-662.)  Thus, the witnesses statements relied on

by the hearing officer were much less detailed than the testimony presented at trial, as the

witnesses were not subject to examination.  (Lod. Doc. 32 at 662-666; compare RT 170-216,

375-395.)  Indeed, as pointed out at trial, Officers Daulton and Zaragosa's testimony regarding

the "Spot" statement was not included in their reports and was therefore not considered by the

hearing officer.  Thus, the evidence presented at the administrative hearing was less reliable than

the evidence presented at trial.  At the evidentiary hearing, the hearing officer had no knowledge

of Petitioner's administrative hearing at the time of the evidentiary hearing.  Moreover, an

associate warden testified that the hearing officer simply made a mistake.

The cases cited by Petitioner are inapposite.  In Burks v. United States, 437 U.S. 1, 2

(1978), the issue was whether a defendant may be subject to a second trial if the conviction in the

first trial was reversed by an appellate court solely for lack of sufficient evidence.  Thus, Burks

involved a completely different issue.  Ashe v. Swenson, 397 U.S. 436 (1970) is also

distinguishable.  This case involved an armed robbery of six victims in the home of one of them.

The defendant was charged in separate counts of robbery of each of the six victims and was tried

on one count and acquitted for insufficient evidence.  The only issue in dispute was whether the

defendant was one of the actual robbers.  Id. at 437-440.  Therefore, collateral estoppel, barred

any subsequent prosecution of the defendant for robbery of a different victim.  Id. at 445.

Considering all of these circumstances, the finding by the administrative hearing officer has no

effect on the jury's finding of guilt in the Kings County Superior Court, and Petitioner's claim is

without merit.

IV.     Admission of Alleged False Testimony

Petitioner contends the state court's denial of an order to show cause on his claim that the

conviction was based on false testimony violated due process.  The "false testimony" referenced

by Petitioner is a statement that Petitioner yelled "Spot they found it" after officers found the

weapon.

Petitioner presented this claim in the state habeas corpus proceedings.  (Lod. Docs. 5-16.)

Similar claims were raised and rejected on direct appeal.  (Lod. Docs. 1-4.)  The superior court

addressed this claim at the 2008 evidentiary hearing and ultimately rejected it in a reasoned

decision.  Petitioner claimed his conviction was based on false evidence and claims defense

counsel should have accepted an offer to exclude the evidence.  Petitioner also claims that

counsel should have sought records and investigated prison policies that could impeach or

disprove the testimony of key prosecution witnesses.

The superior court found that defense counsel's decision to seek a continuance for

discover of the Spot statement was reasonable and a mistrial was not warranted.

The knowing use of false or perjured testimony against a defendant to obtain a conviction

is unconstitutional.  Napue v. Illinois, 360 U.S. 264 (1959).  Petitioner bears the burden of

"alleg[ing] facts showing that there was knowing use of the perjured testimony by the

prosecution."  Pavao v. Cardwell, 583 F.2d 1075, 1076-1077 (9th Cir. 1978).  In the context of

the presentation of false evidence, Petitioner must prove all of the following: "(1) the testimony

1 (or evidence) was actually false, (2) the prosecution knew or should have known that the

2 testimony was actually false, and (3) that the false testimony was material." United States v.

3 Zuno-Arce, 339 F.3d 886, 889 (citing Napue, 360 U.S. at 269-271.)  An allegation only that false

4 or perjured testimony was introduced, however, is not a violation absent knowing use by the

5 prosecution.  Morales v. Woodford, 388 F.3d 1159, 1178-1179 (9th Cir. 2004).

6      The state court found that the testimony was not actually false.  This factual

7 determination is subject to great deference and Petitioner offers nothing more than speculation to

8 overcome it.  Officer Daulton acknowledged that he erred by failing to put the statement in his

9 report.  Officer Zaragosa also acknowledged that he failed to include the statement in his report,

10 did not report the statement to anyone, and did not recall the statement until after his pre-trial

11 meeting with Daulton.  Zaragoza also acknowledged that he did not remember the exact words or

12 what he was yelling to "Spot" about.  Defense counsel also elicited the fact that Correctional

13 Sergeant Lloren, whom Daulton testified was 10 feet away, did not hear Petitioner's "Spot"

14 statement.  (RT 206-207, 374.)  To the extent the officers' testimony was inconsistent or not

15 reliable, defense counsel highlighted those areas for the jury and properly trusted the jury to

16 determine the ultimate facts.  Furthermore, a review of the record supports the superior court's

17 finding that there was not an unconditional offer made to exclude the statement.  The prosecutor

18 stated only that if the trial court was inclined to grant a *mistrial*, then she would not offer the

19 statement.  Thus, it is clear that the prosecutor offered to exclude the evidence in order to

20 potentially prevent a mistrial.  The trial court denied the request for a mistrial and granted an

21 extension of time for defense to investigate the statement.  The superior court reasonably found

22 that such continuance was a proper remedy in lieu of a mistrial.

23      Petitioner's claim that defense counsel should have investigated and sought discovery of

24 prison policies to impeach certain prosecution witnesses, is also without merit.  Officer Daulton

25 acknowledged that the policy of securing all evidence found at a crime scene, and admitted that

26 he failed to comply with such policy stating he did not know what the item was until he returned

27 to Petitioner's cell.  (RT 831-833.)  Zaragoza confirmed Daulton's testimony.  (RT 376-377.)

28 Petitioner has not shown that any further discovery or investigation would have changed the

1   outcome of the proceedings, and his claim is without merit.

2   V.      Ineffective Assistance of Counsel-Ground Five

3          Petitioner raises several additional claims of ineffective assistance by his trial counsel,

4   including 1) the failure to impeach Daulton with his preliminary hearing testimony and with

5   evidence contradicting his description of the cell; 2) the failure to defend against the damaging

6   "Spot" statement; 3) the failure to interview correctional officer Musleh and to elicit his

7   testimony at trial; 4) the failure to interview inmate Freddie Patino; 5) the failure to discover and

8   present evidence of proper crime scene preservation procedures for serious rules violations in the

9   prison setting; and 6) the failure to conduct a site inspection, either prior to or during trial.

10         Petitioner filed a motion for summary judgment under Rule 56 of the Federal Rules of

11  Civil Procedure on this claim.  Rule 56 provides:

12              The court shall grant summary judgment if the movant shows that there is
                no genuine dispute as to any material fact and the movant is entitled to judgment
13              as a matter of law.

14
15         This case is governed by the Antiterrorism and Effective Death Penalty Act

    and the presumption of correctness under § 2254(e)(1) overrides the ordinary summary judgment
16
    principle that disputed facts are to be resolved in favor of the moving party, because the federal
17
    rules of civil procedure are applicable only to extent not inconsistent with habeas procedures.
18
    Moreover, as a general rule, in summary judgment motions, the facts are constructed in the light
19
    most favorable to the party opposing summary judgment:
20
                At the summary judgment stage, facts must be viewed in the light most favorable
21              to the nonmoving party only if there is a "genuine" dispute as to those facts.

22
23         Thus, in habeas corpus proceeding, a petitioner has a slim chance of prevailing on a

    summary judgment motion.[2]  See e.g. Scott v. Harris, 550 U.S. 372, 380 (2007) (. . . "Where the
24
    record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,
25

26   _____

27         [2] To this end, Blackledge v. Allison, 431 U.S. 63, 80-81 (1977) and Clark v. Johnson, 202 F.3d 760, 763-65
     (5th Cir. 2000) do not support Petitioner.  In Blackledge, the Supreme Court contemplated the filing of a summary
28   judgment motion by the Warden, not Petitioner. Blackledge, at 80-81.  Likewise, in Clark, the motion for summary
     judgment was filed by the State.  Clark, at 763.

there is no 'genuine issue for trial.'") (citing Matsushita Elec. Industrial Co. v. Zenith Radio Corp., 472 U.S. 574, 586-587 (1986) (footnote omitted).)  For the reasons explained below, Petitioner has not demonstrated relief under either Rule 56 or 28 U.S.C. § 2254.

These claims were the subject of dispute at the 2008 evidentiary hearing in the Kings County Superior Court, and were ultimately rejected by the state courts.  In denying the claims, the superior court held as follows:

> Petitioner also contends that this conviction was based upon false evidence (i.e., "Spot" statement), which should have been excluded by the trial court. (Petition, Claims 2 and 3, pp. 40, 46.)  The petition states that Hultgren erred by failing to accept an alleged offer to exclude the prejudicial admission not properly disclosed to the defense. (Petition, Claim 8, pp. 79-80.)  In regards to disproving the veracity of the "Spot" statement, Petitioner contends that Hultgren should have subpoenaed inmate movement records and investigated prison policies likely to impeach and/or disprove the testimony of key prosecution witness.  (Petition, Claim 5, pp. 70-71; Reply, 4:¶9.)

> In reviewing an ineffective assistance of counsel claim, courts do not generally second-guess counsel's tactical decisions, "the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*People v. Fosselman* (1983) 33 Cal.3d 572, 665.)  In this case, Hultgren's decision to seek a continuance for discovery surrounding the "Spot" statement seems squarely based on trial tactics and, specifically, the potential for impeachment value of the statement. [Citations.] Although the petition speaks of an "offer" to exclude the evidence, a close review of the trial transcripts confirms that no unconditional "offer" was made.  Rather, the prosecutor stated that, "*[i]f the Court is inclined to grant a mistrial*" she would not offer the statement. [Citation.] However, in determining which sanction was appropriate due to late disclosure of the "Spot" statement, the trial court expressly denied Hultgren's mistrial request and recognized that the exclusion of testimony was appropriate only where, "all other sanctions have been exhausted. . ." [Citation.] On appeal, the trial court's continuance of the trial was deemed an "appropriate remedy" for late disclosure. [Citation.]

> As to whether Hultgren properly investigated prison policies and/or inmate movement records likely to impeach and/or disprove the testimony of key prosecution witnesses in connection with the "Spot" statement, no prejudice has been shown.  During cross-examination at trial, Hultgren explored Correctional Officer Daulton's ("Daulton") unexplained failure to include mention of the "Spot" statement within his report; directly confronting Daulton over his nonsensical explanation. [Citation.] Hultgren underscored the fact that Correctional Sergeant Lloren, whom Daulton testified was only ten feet away, did not hear Petitioner's allegedly yelling to "Spot." [Citation.] Hultgren also confirmed that Correctional Officer Zaragosa had failed to include the incident within his report, never told anyone about the statement, and did not recall that Petitioner had engaged in such conduct until after his pre-trial meeting with Daulton. [Citation.] Upon questioning from the prosecutor, Correctional Officer Zaragosa also admitted that he had no knowledge of Petitioner's exact words and/or what he was yelling to "Spot" about.  [Citation.]

14

During the hearing, none of the testimony elicited by Petitioner sufficiently undermined the prosecution's case so as to demonstrate prejudice by Hultgren's alleged failure to engage in expanded discovery.  Rather, as he did during the initial trial, in face of questions concerning his defective report, Daulton simply admitted that he did not include mention of the "Spot" statement within his report, should have done so, but "made a mistake." [Citations.] Similarly, when questioned about prison policies concerning the securing of a crime scene, Daulton confirmed the policy but then explained his failure to comply therewith by stating that he did not know what the item was until he returned to Petitioner's cell [Citations.]   Based upon the foregoing, this Court declines to find prejudice in Hultgren's failure to engage in additional discovery and/or investigation.  In reaching this determination, this Court has rejected Petitioner's claim that the contradictory finding of Petitioner's subsequent CDC 115 administrative hearing somehow proves that the "Spot" testimony offered by Daulton and Zaragosa was false.  (Petition, Claim 2; p. 40.)  There is no collateral estoppel effect to a CDC 115 administrative hearing. [Citation.]

Petitioner next contends that Hultgren was generally ineffective in his preparation for trial.  (Petition, Claim 4, p. 48; Claim 5, p. 70, Claim 9, p. 85.)  According to Petitioner, Hultgren erred by failing to interview certain witnesses prior to trial, inadequately interviewing Petitioner, not calling certain witnesses to testify, not employing the services of an investigator, and not personally visiting the SHU unit.  Petitioner also contends that Hultgren should have obtained records of inmate movement, transportation logs, cell assignments, policies concerning cell searches and the handling of weapons, diagrams or photos of the cells and/or rotunda area, and filed a Pitchess Motion.  (Reply, ¶4-¶10.)  In a habeas corpus proceeding alleging trial counsel's investigation or presentation of evidence was incompetent, "the petitioner must show [the Court] what the trial would have been like, had he been competently represented, so [the Court] can compare that with the trial that actually occurred and determine whether it is reasonably probable that the result would have been different." [Citations.] After weighing the available evidence, its strength and the strength of the evidence the prosecution presented at trial, the Court must ask itself if the Petitioner has shown a probab[ility] of prejudice, "sufficient to undermine confidence in the outcome" of the trial. [Citation.]

In response to Petitioner's allegations of inadequate investigation, Hultgren testified that he understood one of Petitioner's defenses to be that the knife had been recovered outside of his cell. [Citation.] Hultgren also testified that he read every paper given to him by Petitioner [Citation], and discussed with Petitioner his complaints regarding MTA Miller. [Citation.] An investigator was not initially retained because Hultgren believed that one was not needed. [Citation.] Hultgren also did not believe that a physical inspection of the cell was required, because he had been to the Secured Housing Unit a number of times and had in his possession a number of photos – including one that was of the channel upon which a cell door slides. [Citation.] The Court notes that at least one correctional officer who testified during the hearing, similarly testified to the space beneath SHU cell doors based upon his experience and familiarity with the Unit.  According to Correctional Officer Love, all the cells in the SHU are very similar and would have approximately the same one inch to one and one-half inch clearance measurements around the door; a clearance space potentially sufficient to allow the knife to be brought into Petitioner's cell. [Citations.] Further, the knife at issue was wrapped in a white substance was located on a dark floor.  There is no credible evidence elicited at the hearing that such an easily seen item necessitated special investigation as to its visibility.  The issue was not visibility,

but where the knife was actually found.  Despite impeachment attempts, Officer Daulton testified credibly at the hearing that the knife was found in the Petitioner's cell.  The jury could have similarly found Daulton's trial testimony regarding the knife's placement to be credible.  Further, Petitioner was initially charged with possessing two different weapons on two different days.  He did not challenge Mr. Hultgren's effectiveness as trial counsel on the first weapon and its related criminal charge and conviction.  Petitioner's contention was that hostile prison employees must have planted both of these items.  There was not any credible evidence presented at the hearing that supported such a contention.  Finally, it is relevant that Petitioner's own standard of care expert opined that it was proper for Hultgren to have taken into account his experience and knowledge as to a particular area in determining what type of pre-trial investigation was needed to be performed; stating, "Mr. Hultgren was at that time a very experienced attorney . . . He could make those decisions." [Citation.]

According to Hultgren, he did not bring any inmate witnesses to testify on behalf of Petitioner because Petitioner had told him nothing that another inmate was going to add that would have helped and, in his opinion, "parading a flock of inmates in front of a Kings County jury is largely ineffective." [Citation.] Hultgren explained:

> It would have been based on what he told me they were going to say.  And if I thought it was going to be worth while enough to overcome the general notion that juries are loathed to believe that sort of thing, then I would have done it. . .  I obviously got to the point where I didn't think they had anything to add that was going to be of any benefit to us. [Citation.]

Again, Petitioner's Strickland expert admitted that Hultgren's conduct was proper in that she too would have taken into consideration the criminal records of potential inmate witnesses and their ability to see what happened on the day of the incident. [Citation.] It should be noted that James Davis, Hultgren's mid-trial investigator, stated that the inmates interviewed by him had no firsthand knowledge of the incident. [Citation.]

As to Correctional Officer Musleh specifically, who was alleged by Petitioner to know that Petitioner did not have possession of the knife within his cell, no prejudice was shown to have resulted from Hultgren's failure to interview the potential witness prior to trial. [Citation.] Petitioner's allegation that Inmate Patino would have been a helpful witness at trial is undermined by Musleh's confident denial of knowledge related to the confiscated weapon.  The only eye witnesses to the location of the weapon (other than Petitioner) were Correctional Officers Saragosa and Daulton.  Accordingly, it is the opinion of this Court that the parade of witnesses offered at the evidentiary hearing did little to shake this Court's confidence as to the outcome of the trial. [Citation.] Similarly, although Petitioner was given the opportunity to secure relevant documents, logs, and Pitchess materials in preparation for the evidentiary hearing; documents which Hultgren admitted that he did not pursue [Citation][,] those documents did little to solidify  a picture of prejudicial ineffective representation on the part of Hultgren.

Petitioner also criticizes Hultgren's failure to utilize alleged contradictory preliminary hearing testimony by Zaragosa and Daulton to impeach and/or otherwise undermine Respondent's theory that the knife was initially located within Petitioner's cell. [Citation.] However, a close review of the trial transcripts confirms that Hultgren took steps to challenge the Officers' recall as to the

16

location of the knife which resulted in testimony consistent with that given during the preliminary hearing.  Specifically, through his cross-examination at trial, Hultgren secured an admission from Daulton that while he first saw the knife in the doorway of Petitioner's cell, he did not know whether the knife originally laid to the inside of the door. [Citation.] Hultgren also secured a statement from Zaragosa, *to wit*: "we keep our contact on him to see if there's any type of movement or any aggressive action with the inmates.  So I know we didn't pay mu[ch] attention to it [the knife]." [Citation.] During the preliminary hearing, Daulton testified that he first saw the knife located in the doorway of Petitioner's cell and that at the time of handcuffing Petitioner, his attention was on the inmate and not on the floor. [Citation.] Highlighting the fact that had Petitioner known about the knife and wished to keep it from discovery, all he had to do was refuse to go to yard (Reporter's Transcript for March 18, 2002, 214:25-2; Reporter's Transcript for March 19, 2002, 376:8-16 [Bakken could have denied the offer for yard]) Hultgren appears to have competently raised a question as to Petitioner's knowledge about the knife and/or its initial location.  Accordingly, although a dispute exists as to whether Hultgren actually reviewed the preliminary transcript prior to trial (Petition, Claim 6; c.f., Hearing Transcript, Vol. II, 425:27-426:1 [Hultgren testified he would have reviewed transcript if prepared]), there appears to have been no prejudicial effect in Hultgren's failure to utilize preliminary hearing testimony during trial.  (*Strickland v. Washington*, *supra*, 466 U.S. at p.687 [Defendant must make showing of prejudice].) [FN 1]

    FN1. See also, Opinion in Court of Appeal, Fifth Appellate District, Case No. F040526, p.19, finding a clear tactical purpose behind not questioning Officer Saragosa about his preliminary hearing testimony.

(Lod. Doc. 12 at 3-8.)

A.    Failure to Impeach Officer Daulton

Petitioner contends that defense counsel failed to impeach Officer Daulton with his testimony from the preliminary hearing and present evidence to contradict his description of Petitioner's cell.

Officer Daulton testified at the evidentiary hearing and the superior court found that despite impeachment efforts, his testimony was credible that the knife was found in Petitioner's cell.  Thus, the jury could have reasonably found Daulton's testimony to be reliable.  Officer Daulton's testimony was corroborated by Officer Love's testimony who was familiar with the cells in the Secured Housing Unit (SHU) and stated a knife could fit under the cell door.  Each cell was similar and had approximately one inch to one and a half inch clearance at the bottom of the cell door, which would allow a knife to fit under.  In addition, Petitioner's investigator testified that

With regard to the preliminary hearing testimony by Daulton, the superior court found

1    that after reviewing the trial transcripts, defense counsel sufficiently challenged Daulton's

2    memory of the location of the knife and presented testimony that was consistent with that at the

3    preliminary hearing. (Lod. Doc. 12 at 7.)  More specifically, defense counsel elicited an

4    admission by Daulton that although he first saw the knife in the doorway of Petitioner's cell, he

5    did not know if it originally laid inside of the door.  (Id. at 8.)  Officer Zaragosa also admitted

6    that the officers were focused on Petitioner's movement and not on the knife on the floor.  (Id.)

7    At the preliminary hearing, Daulton testified he first saw the knife in the doorway of Petitioner's

8    cell and his attention was on Petitioner, not the floor.  (Id.)  Therefore, defense counsel

9    competently raised the issue of Petitioner's knowledge of the knife and its original location.

10   Therefore, counsel's failure to read or specifically use the preliminary hearing testimony could

11   not have been prejudicial.

12       The testimony presented at the evidentiary hearing supports the state courts'

13   determination.  Correctional Officer Chay Jay Love testified that he was familiar with the cells in

14   the Secured Housing Unit (SHU) and stated there is an inch to an inch and a half clearance under

15   all the cell doors. (Lod. Doc. 29 at 858-859.)  He opined that all the cells in the SHU were

16   similar and opined that there would be approximately less than a quarter inch of variance. (Id. at

17   859-860.)  Love also testified that a weapon, as involved in this case, could fit under the door

18   even with a paper sheath, and without the sheath it could unquestionably fit under the door.  (Id.

19   at 871; Lod. Doc. 27 at 55.)  Love stated there are several different ways for inmates to get

20   weapons including, "fishing," at shower time, yard time, and concealed in food. (Lod. Doc. 31 at

21   8-11, 18-20.)

22        During cross-examination of Richard Barnes, Petitioner's investigator, unequivocally

23   acknowledged that the weapon could fit under Petitioner's cell door, especially if not wrapped in

24   a sheath. (Lod. Doc. 27 at 61-62, 64-68, 70, 72, 76, 82.)  Barnes testified that without the sheath

25   the weapon was about one-tenth of an inch thick.  (Id. at 61, 68.)  From the outside of the cell,

26   even with the metal plate at the bottom, the gap between the floor and bottom of the door was

27   about a quarter inch to an inch and an eighth.  (Id. at 61-62, 64-65, 68.)  On the inside of the

28   door, the gap between the door and floor measured approximately one inch to one and one-

quarter inches.  (Id. at 70, 72.)

At the evidentiary hearing, Petitioner's counsel was not able to impeach Daulton's testimony regarding the discovery of the weapon.  Daulton testified unequivocally, as he did at trial, that he saw the weapon in the track of the door of Petitioner's cell.  (Lod. Doc. 29 at 815, 817-818, 834-835, 841.)  Therefore, the state court reasonably found that Petitioner did not suffer any prejudice as a result of counsel's alleged failure to review the preliminary hearing transcript.

Also, the fact that defense counsel admitted to using marijuana after the trial, did not prejudice Petitioner.  Defense counsel stated that the marijuana use did not affect him the following day and it did not affect his memory.  (Lod. Doc. 29 at 618, 654-655, 656.)  The Strickland standard applies to counsel's alleged drug use. Bonin v. Calderon, 59 F.3d 815, 838 (9th Cir. 1995).  The Ninth Circuit has found that drug usage is not relevant in and of itself to an ineffective assistance claim.  Id. (citing Berry v. King, 765 F.2d 451, 454 (5th Cir. 1985)).  The relevant determination is whether counsel's performance was deficient and caused prejudice.  Id. Petitioner has failed to make any showing that counsel's representation at trial was affected by the purported drug use.  Having not been presented with any evidence of prejudice, the state court impliedly found that counsel's marijuana use was non-prejudicial.  This finding was reasonable and Petitioner has failed to demonstrate otherwise.

### B.   Defense Counsel's Failure to Defend Against "Spot" Statement

Petitioner contends that defense counsel failed to adequately defend against the "Spot" statement.

The testimony at the evidentiary hearing did not call into question the prosecutor's case at trial so as to demonstrate prejudice for the late disclosure of the "Spot" statement.  At the evidentiary hearing, as he did at trial, Officer Daulton acknowledged that he failed to include the statement in his report by mistake and should have done so.  Daulton also acknowledged that it was prison policy to secure a crime scene and he failed to comply with such policy by securing the weapon until he returned to Petitioner's cell.  Based on these circumstances, it was reasonable for the superior court to find Petitioner failed to demonstrate prejudice regarding the investigation of the "Spot" statement and prison policies.

C.    Failing to Interview Officer Musleh and Inmate Patino

Petitioner also contends that defense counsel failed to interview Officer Musleh and inmate Patino.

In a confidential hearing that was part of the evidentiary hearing, Musleh unequivocally denied having any personal knowledge of whether Petitioner possessed the weapon.  In 2001, Musleh served Petitioner with a disciplinary infraction, and Petitioner attempted to get Musleh to admit that he knew the weapon did not belong to Petitioner.  However, Musleh stated that he did not know if the weapon belonged to Petitioner or not, he was merely serving the charging document-CDC 115.  Musleh testified that he never told Petitioner or anyone else that the weapon did not belong to Petitioner.

Petitioner argues that Musleh's testimony was chilled as a result of disciplinary action taken against him.  However, Petitioner offers nothing more than his pure speculation in support of his argument.  Petitioner makes a large number of arguments attacking the credibility of Officer Musleh and his testimony, as well as questioning what may be inferred from his testimony.  "[A] federal corpus court faced with a record of historical facts that supports conflicting inferences must presume-even if it does not affirmatively appear in the record-that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution."  Jackson v. Virginia, 443 U.S. 307, 326 (1979); see also 28 U.S.C. § 2254(e)(1); Miller-El v. Cockrell, 537 U.S. at 340.  Determining the credibility of witnesses and the relative weight to be attributed to their testimony is not within the realm of this Court sitting in a habeas proceedings.  These are questions of fact to be determined only by the trier of fact, and thus may not be considered in the instant case.  Thus, the superior court reasonably found Musleh to be credible and this finding is presumptively correct, and Petitioner has not met his burden of rebutting this presumption.

D.    Failure to Investigate Crime Scene Preservation Issues and Failure to Conduct a Site Inspection

Petitioner claims defense counsel failed to discover and present evidence of the proper crime scene prevention procedures and did not conduct a site inspection of Petitioner's cell.

1    Defense counsel testified that he did not initially retain an investigator because he

2    believed it was not necessary.  Counsel also did not believe a physical inspection of the cell in

3    the SHU was necessary because he had previously viewed the cells and had photographs

4    including, a photo of the channel upon which the cell door slides.  (Lod. Doc. 12 at 4-5.)

5    Petitioner faults counsel for failing to impeach officer Daulton regarding the physical

6    characteristics of the cell.  However, at the evidentiary hearing, Daulton was unequivocal that the

7    knife was found in Petitioner's cell.  Correctional Officer Love testified that all the cells in the

8    SHU are very similar and have approximately the same one inch to one and a half inch clearance

9    at the bottom of the cell door, in which a knife could have fit under.

10    With regard to the crime scene preservation, at the time Officers Daulton and Zaragosa

11    kicked the item back into Petitioner's cell, they were not aware of the nature of the item.  After

12    Petitioner was released to the exercise yard, the officers returned to Petitioner's cell and retrieved

13    the weapon.  The crux of this case involved whether the officers saw the knife on the cell-door

14    track.  Although officers may not have preserved the crime scene in compliance with prison

15    policy, there is no showing that this would have created a reasonable probability of a better result

16    for Petitioner.  In fact, even the expert admitted that his investigations went above and beyond

17    the usual investigations conducted by CDCR.  (Lod. Doc. 28 at 400-404.)  To this end, Petitioner

18    merely argues through speculation that the contamination of the crime scene and inadequate

19    efforts to preserve it should cast doubt on the legitimacy of the officers' reports.

20    Accordingly, based on the foregoing, the state courts' denial of relief was neither contrary

21    to nor an unreasonable application of federal law, nor was the state courts' denial an

22    unreasonable determination of the facts in light of the state court record.

23    VI.    Prosecutorial Misconduct/Cumulative Prejudice

24    Petitioner contends the prosecutor committed misconduct and he is entitled to relief based

25    on the cumulative prejudice resulting from the errors.

26    This claim was first raised on direct appeal to the state appellate court which found the

27    claim to be waived because of the lack of objection during trial.  The claim was not presented in

28    the petition for review to the California Supreme Court.

1    Petitioner also presented this claim in the 2005 to 2007 state habeas corpus proceedings.

2    (Lod. Docs. 5-10.)  In its 2006 denial order, the superior court invoked California's timeliness

3    bar. (Lod. Doc. 6 at 2-4.)  The state appellate court issued a summary denial of the claim.  (Lod.

4    Doc. 8.)  The California Supreme Court's 2007 order directing the issuance of an order to show

5    cause only disregarded the timeliness bar as to the ineffective assistance of counsel claim. The

6    subsequent state court denial orders also did not disregard the timeliness bar as to the

7    prosecutorial misconduct/cumulative prejudice claim.  Therefore, the timeliness bar is still intact

8    with regard to this claim.

9    Respondent argues that this claim is barred by the doctrine explained in Forrest v.

10   Vasquez, 75 F.3d 562, 563-564 (9th Cir. 1996).  In Forrest, the Ninth Circuit found that the

11   citation to Waltreus in that case demonstrated that the basis of the decision by the California

12   Supreme Court was procedural default.  The petitioner appealed his conviction to the California

13   Court of Appeal arguing, in part, that he had been denied access to the law library.  The

14   California Court of Appeal affirmed his conviction.

15   A denial and citation to In re Waltreus refers to California's procedural rule that "issues

16   actually raised and rejected on appeal cannot be renewed in a petition for writ of habeas corpus."

17   Forrest v. Vasquez, 75 F.3d 562, 563 (9th Cir. 1996) quoting In re Harris, 5 Cal.4th 813, 829

18   (1993).  In Ylst v. Nunnemaker, the Court concluded that a Waltreus citation is neither a ruling

19   on the merits nor a denial on procedural grounds thereby having no bearing on a petitioner's

20   ability to raise a claim in federal court.  Ylst v. Nunnemaker, 501 U.S. 797, 805, 111 S.Ct. 2590,

21   2595 (1991).  Thus, federal court's must "look through" the petition to the state court's prior

22   decision and determine the grounds for the prior denial. Id. at 803, 806, 111 S.Ct. at 2594, 1296;

23   Forrest, 75 F.3d at 563-64.

24   However, if a claim was raised on direct appeal but not in a petition for review to the

25   California Supreme Court the court need not "look through" a denial because a citation to In re

26   Waltreus indicates a procedural bar to bringing the claim in federal court.  Id.  The Ninth Circuit

27   has reasoned that in these circumstances, the procedural bar results not from the violation of the

28   In re Waltreus rule barring claims raised and rejected on appeal, but from the failure to follow

22

1   Rule 8.504(b) of the California Rules of Court (former Rule 28(b) prescribing the time for filing

2   for review by the California Supreme Court). Id. The reasoning in Forrest appears to apply

3   equally to a petition for review which omits certain claims.

4       In this case, Petitioner raised this claim in his direct appeal to the California Court of

5   Appeal. (Lod. Doc. 1.)  However, the claim was not presented in his petition for review to the

6   California Supreme Court.  (Lod. Doc. 3.)  In 2006, the superior court invoked the Waltreus bar

7   in denying this claim on habeas corpus.  (Lod. Doc. 6 at 2, 4.)  The subsequent state habeas

8   corpus denials did not disregard the Waltreus bar, accordingly this claim is barred by the

9   rationale set forth in Forrest.  In any event, for the reasons discussed infra, the claim fails on the

10  merits.

11      A habeas petition will be granted for prosecutorial misconduct only when the misconduct

12  "so infected the trial with unfairness as to make the resulting conviction a denial of due process."

13  Darden v. Wainwright, 477 U.S. 168, 171, 106 S.Ct. 2464 (1986) (quoting Donnelly v.

14  DeChristoforo, 416 U.S. 637, 643, 94 S.Ct. 1868, 1871 (1974)); see, Bonin v. Calderon, 59 F.3d

15  815, 843 (9th Cir. 1995).  To constitute a due process violation, the prosecutorial misconduct

16  must be "of sufficient significance to result in the denial of the defendant's right to a fair trial."

17  Greer v. Miller, 485 U.S. 756, 765, 107 S.Ct. 3102, 3109 (1987) (quoting United States v.

18  Bagley, 473 U.S. 667, 105 S.Ct. 3375 (1985)).  Under this standard, a petitioner must show that

19  there is a reasonable probability that the error complained of affected the outcome of the trial -

20  i.e., that absent the alleged impropriety, the verdict probably would have been different.

21  Furthermore, prosecutorial misconduct is subject to harmless error analysis.  Brecht v.

22  Abrahamson, 507 U.S. at 638 (an error is harmless unless it had a "substantial and injurious

23  effect or influence in determining the jury's verdict").

24      A.    Leading Questions

25      Petitioner contends that much of the prosecutor's questioning during direct examination

26  consisted of leading questions.  However, Petitioner admits that the evidence regarding discovery

27  of the weapon and the incriminating "Spot" statement were not the result of leading questions.

28  (2nd Amd. Pet. at 89.) (See also RT 176:23-26, RT 178:4-6; RT 198:17-24.)  This evidence was

1  compelling to the finding of guilt.

2       Petitioner points to instances in which the questioning during direct examination resulted

3  in "Yes," "That's right," "Correct," and "Yes, it is" answers, citing RT 86, 88, 124, 146, 172,

4  257, 362, and claims such questions were leading.  Under California law, "'A question calling for

5  a 'yes' or 'no' answer is a leading question only if, under the circumstances, it is obvious that the

6  examiner is suggesting that the witness answer the question one way only, whether it be 'yes' or

7  'no.'"  People v. Williams, 16 Cal.4th 635, 672 (1997).  Moreover, under California law, "A

8  leading question is permissible on direct examination when it serves 'to stimulate or revive [the

9  witness's] recollection.'  People v. Williams, 16 Cal.4th at 672.

10      Even if it is assumed the prosecutor used leading questions, Petitioner has not and cannot

11 show that the form or content of the prosecutor's questions was so egregious as to deny him a fair

12 trial.  With respect to leading questions, "[i]n the discretion of the judge, some leading questions

13 can be proper and would only justify reversal if their use amounted to a denial of a fair trial."

14 Turner v. Marshall, 63 F.3d 807, 818 (9th Cir. 2007), overruled on other grounds by Tolbert v.

15 Page, 182 F.3d 677, 685 (9th Cir. 1999).  Leading questions are frequently re-phased to avoid the

16 leading question problem.  There is no indication here that any of the information elicited was

17 vital and hinged on the prosecutor asking a leading question to obtain the testimony.  Petitioner

18 cites no reason to believe the jury's verdict would have been different if the prosecutor had

19 refrained from using any leading questions.  The few instances cited by Petitioner in which

20 witnesses were allowed to answer leading questions did not result in such "unfairness as to make

21 the resulting conviction a denial of due process."  Darden, 477 U.S. at 181.  Indeed, the

22 referenced witnesses were prison guards who were being asked questions to describe the

23 environment in which they worked and the type of events that take place within the institution

24 which may tend to "blend together" in their minds.  For instance, one officer indicated that he

25 made inmate cell moves more than he could count.  (RT 126.)  Another officer conducted

26 numerous cell searches but specifically remembered the search of Petitioner's cell on July 16,

27 2001, because of Petitioner' strange behavior.  (RT 149-150, 152.)  In addition, these witnesses

28 were subjected to thorough cross-examination by defense counsel.  Accordingly, the state court's

denial was not contrary to, or an unreasonable application of, clearly established federal law.

### B.   Questions Calling For Hearsay Or Information Outside Personal Knowledge

Petitioner contends the "officers were frequently asked what they had been told by other officers or what the 'understanding in the institution' was with respect to particular tendencies of inmates, rather than what they actually knew of their own personal knowledge." (2nd Amd. Pet. at 90-91.)  In support of his argument, Petitioner cites two examples, pointing to the Reporter's Transcript at 88 and 161-162.)  In one instance, an objection as to foundation was sustained.  (RT 162.)  The one other unobjected-to question could not have had an impact on the jury's verdict considering the single question and answer in the context of the entire trial proceedings.

### C.   References To The Fact Petitioner Was Housed In The SHU

Petitioner contends that the prosecutor's references to the fact that he was housed in the SHU amounted to "bad character" evidence.  The fact that Petitioner was housed in the SHU was relevant to the circumstances of the case.  The events that gave rise to the criminal charges all took place within the SHU.  Therefore, the special circumstances, rules and regulations that govern the unit, Petitioner's knowledge of such rules and regulations, and the officers' compliance with policy when seizing evidence from a cell, were all relevant to whether Petitioner was guilty or innocence.

### D.   Testimony That Validated Gang Members Are Housed In The SHU

Petitioner contends the prosecutor failed to prevent correctional officer witnesses from mentioning that Petitioner was housed in a unit reserved for validated gang members.  During the presentation of the defense, an officer testified that validated gang members were housed in Petitioner's section of the SHU.  (RT 343-344.)  Another officer's reference to the fact Petitioner's unit was housed by validated gang members was successfully objected to.  (RT 149-150.)  There was no specific reference to Petitioner being identified as a gang member.  Therefore, the one single unobjected-to reference to his housing in the validated gang member unit could not have been prejudicial in the scheme of the entire trial.  Correctional Sergeant Lloren merely stated that on March 25, 2001, he was working in Building 4, the validated prison gang section, and on March 24th he had a conversation with MTA Miller in which he instructed

him to document how he was threatened by Petitioner.  (RT 343-344.)  There was no specific

reference made to Petitioner and no further reference to gang validation was made.  It is clear

from a review of the record that this isolated instance did not cause prejudice to Petitioner.

Accordingly, the state court's denial of this claim was not  contrary to or, an unreasonable

application of federal law.

E.      References To Misbehavior By Other Inmates

Petitioner contends he was prejudiced by the prosecutor referring to alleged misconduct

by other inmates.  Petitioner cites to references of "gassing" inmates practice of throwing urine

and feces at officers, and "keestering" inmates secreting a weapon that has been wrapped in

paper in his rectum.

This evidence was presented to demonstrate why MTA Miller requested that Petitioner be

moved to a cell with a plexiglass-covered door.  The reference to "keestering" was presented to

explain the reason why full body cavity searches are conducted on inmates.  (RT 229-230.) There

was no reference to the fact that Petitioner himself had ever engaged in the acts of "gassing" or

"keestering." Based on these circumstances, the evidence was relevant and there was no resulting

prejudice.

F.      Eliciting Sympathy For Miller

Petitioner claims the prosecutor attempted to gain sympathy for MTA Miller by

portraying him as being a victim of abuse by Petitioner and other inmates.  The presentation of

evidence that Miller had problems with other inmates, refuted the defense's theory that Miller

had a special animosity toward Petitioner. (RT 275, 276, 286, 319.)  Therefore, the prosecutor

did not commit misconduct by presenting this evidence.

G.      Insinuating That Petitioner Had A Contagious Disease And Sold Drugs

Petitioner contends the prosecutor insinuated that he had a contagious disease and/or

hoarded and sold drugs.  The prosecutor's reference to contagious diseases was made in the

context of officer's searching inmates' cells for needles and the necessary precautions taken to

insure there is no direct contact with needles.  These statements were made in general and were

not made with reference to Petitioner actually having a contagious disease.  The prosecutor was

merely pointing out that MTA Miller was required to dispense a variety of medications ranging from a psychiatric problem to a liver problem.  (RT 273.)  Further, the prosecutor pointed out that inmates may tend to hoard medications in their cell which could be later sold creating a huge danger to the security of the facility.

H.   Suggesting During Argument That Defense Counsel Did Not Believe He Had Established Reasonable Doubt

Petitioner also argues the prosecutor improperly suggested that, based on a comparison to his arguments in other cases, defense counsel's argument demonstrated he did not believe he had established reasonable doubt.

In closing argument, defense counsel presented two different analogies to assist the jury in understanding the meaning of reasonable doubt.  (RT 439-440, 442, 444-445.)

The prosecutor responded to defense counsel's argument in rebuttal stating:

> Now, you've been told a bunch of different things about reasonable doubt that I've never heard before.  Pretty creative.  The accountant theory of reasonable doubt, never heard that one before.  Kind of interesting and pretty creative, by the way.  But the accountant theory, if your accountant gives you a memo and it says one thing, and then you have information that says another thing, if you need to call the bank you have a reasonable doubt.  Oh, no.  If you leave the iron on or you think you leave the iron on and you call home and you say, hey, honey, did I leave the iron on?  That's reasonable doubt.  No.  Normally Mr. Hultgren [i.e., defense counsel] says if you feel it right here, you know it's reasonable doubt.  He didn't say that this time.

(RT 462-463.)

Petitioner's claim that the prosecutor was insinuating that defense counsel did not believe his defense is not supported by the record.  Defense counsel presented a new and "creative" analogy to explain the reasonable doubt standard to the jury.  Indeed, defense counsel explained the accountant theory was "what we're faced with here . . ."  (RT 439-440.)   In addition, defense counsel explained the other analogy was relevant in this case to support the finding of a reasonable doubt.  (See RT 442 "There's an analogy that I have used on occasion, and I think it fits here.")  The prosecutor stated she believed the analogies were "creative" and "interesting" and  she had never heard them before.  (RT 462-463.)  The prosecutor explained this by stating defense counsel had varied his argument regarding reasonable doubt.  Based on the foregoing,

1  the state courts' determination of this issue was not contrary to, or an unreasonable application

2  of, clearly established Supreme Court precedent.

3     I.  Evidence In Support Of Petitioner's Guilt

4     Moreover, there was compelling evidence in support of Petitioner's guilt including, the

5  **"**Spot" statement and the fact the weapon was found just outside his cell.  Officer Daulton first

6  saw the weapon in the doorway of Petitioner's cell, and Officer Zaragosa saw Petitioner kick the

7  weapon out of his cell.  The weapon was on the track of the door and there is a space between the

8  bottom of the door and the floor.  (RT 181, 226, 230-231.)  Lieutenant Diaz testified as an expert

9  on possession and manufacture of inmate weapons, and explained how inmates use homemade

10  "fishing line" to move items from cell to cell.  The weapon in this case could have been "fished"

11  into Petitioner's cell through the space under the cell door.  Diaz also indicated that inmates can

12  secure and hide weapons underneath the cell door.  (RT 233.)

13     With regard to the "Spot" statement, Petitioner was taken from the yard to a rotunda

14  holding cell where he was informed that something was discovered in his cell.  (RT 198.)

15  Petitioner then began yelling something to the effect of, "Spot, it's gone.  Spot they've got it.

16  (Id.)  There was evidence presented that an inmate named Shaffer, nickname of "Spot," lived on

17  the same housing unit as Petitioner.  (RT 199-200.)  Daulton acknowledged that he mistakenly

18  did not write this statement in his report.  (RT 200-201.)  Daulton told Sergeant Lloren about the

19  "Spot" statement on the day it occurred; however, Lloren did not recall Petitioner yelling on that

20  day.  (RT 205-208, 374.)  Officer Zaragosa confirmed that he heard Petitioner yell to "Spot" who

21  was housed in the same unit as Petitioner.  (RT 377, 387.)  Zaragosa also acknowledged that he

22  did not write this statement in his report as he did not believe it was relevant at the time.  (RT

23  378-389.)  Based on the foregoing, there was sufficient evidence in support of Petitioner's guilt.

24     J.  Cumulative Prejudice

25     Because there was no prejudicial error in this case, there can be no cumulative error.

26  Cumulative errors applies where, "although no single trial error examined in isolation is

27  sufficiently prejudicial to warrant reversal, the cumulative effect of multiple errors may still

28  prejudice a defendant."  Mancuso v. Olivarez, 292 F.3d 939, 957 (9th Cir. 2002) (as amended)

1   (quoting United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996).  The Court must

2   determine whether the cumulative error "so infected the trial with unfairness as to make the

3   resulting conviction a denial of due process."  Hein v. Sullivan, 601 F.3d 897, 917 (9th Cir.

4   2010) (citation omitted); Jackson v. Brown, 513 F.3d 1057, 1085 (9th Cir. 2008).

5        Petitioner's claims have been addressed and denied in detail above.  The alleged errors,

6   even if considered together, simply do not rise to the level of a due process violation or

7   prejudicial error.  Indeed a large majority of Petitioner's arguments are based on his disagreement

8   with the superior court's factual findings, and attempt to relitigate the issues in this Court.  The

9   Supreme Court recently reiterated in Harrington that, subject only to the exceptions in §§

10  2254(d)(1) and (d)(2), claims "adjudicated on the merits" in state court cannot be relitigated on

11  habeas review.  131 S.Ct. at 784-785.

12  VII.   Motion For Immediate Release

13       The Ninth Circuit has not yet determined if a federal district court has the authority to

14  release a state prison on bail pending resolution of a habeas corpus petition.  In re Roe, 257 F.3d

15  1077, 1079-1080 (9th Cir. 2001).  Even if it assumed this Court has the power, the exercise of

16  such authority is reserved for extraordinary cases.  Id.; see also United States v. Mett, 41 F.3d

17  1281, 1282 (9th Cir. 1994) (bail pending the resolution of a habeas corpus petition in the district

18  court is reserved to "extraordinary cases involving special circumstances" and there is a high

19  probability of success on the merits).  The Court must also consider the potential risk of flight

20  and danger to the community if the petitioner were released.  Marino v. Vasquez, 812 F.2d 499,

21  508-509 (9th Cir. 1987).

22       For the reasons explained herein, there is no probability of success on the merits as the

23  undersigned has recommended that the instant petition for writ of habeas be denied on all

24  grounds.  Accordingly, Petitioner's motion for release on bail should be denied.

## RECOMMENDATION

26       Based on the foregoing, it is HEREBY RECOMMENDED that:

27       1.     Petitioner's motion for summary judgment on Ground Five be DENIED;

28       2.     The instant petition for writ of habeas corpus be DENIED;

3.    Petitioner's motion for immediate release be DENIED; and

4.    The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California. Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:    __October 5, 2011__          _____/s/ **Dennis L. Beck**_____
                                        UNITED STATES MAGISTRATE JUDGE